

**FILED**

Dec 13 2017, 6:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

**ATTORNEY FOR APPELLANT**

David Becsey
Zeigler Cohen & Koch
Indianapolis, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tanesha McGowan,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | December 13, 2017<br><br>Court of Appeals Case No.<br>49A02-1706-CR-1421<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Kurt Eisgruber,<br>Judge<br><br>Trial Court Cause No.<br>49G01-1403-FC-14835 |

**Brown, Judge.**

[1] Tanesha McGowan appeals her convictions for three counts of neglect of a dependent as class C felonies. She raises one issue which we revise and restate as whether the evidence is sufficient to sustain her convictions. We affirm.

*Facts and Procedural History*

[2] James Loynes was the father of T.L., J.L., and J.L.J.R. After the mother of T.L., J.L., and J.L.J.R died in Atlanta, Georgia, in 2008, T.L., J.L., and J.L.J.R., began living with Loynes who moved to Atlanta with his girlfriend McGowan and McGowan's child D.A. At some point, McGowan gave birth to K.L. While living in Georgia, McGowan helped take care of T.L. J.L., J.L.J.R., K.L., and D.A. McGowan cooked, enrolled the children in school, transported them to school, and assumed a "kind of a parent-like role." Transcript Volume II at 108.

[3] In 2011, Loynes, McGowan, and the children moved to Indiana and initially lived in the house of McGowan's sister in Indianapolis. McGowan continued to cook for the children and transport them to school. Indianapolis Metropolitan Police Detective Christopher Lawrence testified that all of the children were under eighteen years old between 2011 to 2013. At this residence, J.L.J.R. observed marijuana in the house. J.L. observed marijuana and a white crystalline substance packaged in clear bags out in the open sometimes, T.L., J.L.J.R., K.L., and D.A. around cocaine, McGowan around the drugs, McGowan accept money for drugs, and the cooking or making of drugs in the kitchen when McGowan and the children were around. Before

and after school, McGowan took the children to trap houses.[1] J.L. would sometimes go into the trap houses with other children and McGowan and observe drugs and money on tables, and McGowan would take money if Loynes was not present. J.L. observed McGowan exchange cocaine or pills for money while taking him to school or picking the children up from school.

[4] McGowan, Loynes, and the children then stayed in hotels, and McGowan and Loynes would be gone from the hotel for "[s]ometime hours, sometime days," and the children stayed at the hotel by themselves. *Id.* at 19. At that time, J.L., the oldest of the children, was thirteen years old. McGowan would say that she and Loynes were going to a trap house, which T.L. thought meant a drug house. T.L. saw guns on Loynes and sometimes under the "beds and stuff" where T.L. could access them.

[5] McGowan, Loynes, and the children eventually moved to a house near 29th Street. T.L. observed marijuana and cocaine or crack in the house. She also observed Loynes making crack in the kitchen and placing the crack on a scale in the kitchen when the other children and McGowan were in the house. Family members and friends would visit and smoke marijuana. J.L.J.R. observed

---

[1] Indianapolis Metropolitan Police Detective Stephen Krieger testified:

> Trap houses are also known as stash houses, and a lot of times trap houses or a stash house is a home or it could be an apartment or any dwelling, I guess, that a narcotics dealer or somebody who's dealing in contraband uses specifically for the reason of selling their narcotics out of the dwelling as part of their narcotics enterprise.

Transcript Volume II at 146.

"white stuff" in a Ziplock bag or pill bottle that Loynes sold. *Id.* at 75. McGowan was present when these exchanges occurred inside the house. J.L. observed marijuana, cocaine, and crack cocaine out in the open in the living room. J.L. also observed Loynes exchange drugs and McGowan accept money for drugs when the children were in the room or in an area where they could potentially see the exchanges occur. T.L. observed long guns and shotguns behind "stuff, like chairs or TVs or something," while the children were present. *Id.* at 24. J.L.J.R. observed a revolver and a shotgun in the house. While they were residing in the house near 29th Street, J.L.J.R. found a shotgun under a chair, picked it up, pulled the trigger by accident, and shot it through the floor when McGowan and Loynes were not home. During this time, McGowan would also bring the children along while she was on her way to a trap house, enter the house or stop at the door of the house, and return to the car where the children were present.

[6]     At some point, they moved to a residence on King or Livingston. T.L. observed marijuana in the house, J.L.J.R. observed Loynes sell pills for money, and J.L. observed drug dealing when the children and McGowan were around. They then moved to a house on Temple where T.L. observed marijuana, cocaine or crack "laying around" and packaged in bags. *Id.* at 29. T.L. observed Loynes handle the crack or cocaine and sell drugs inside and outside of the house. Loynes or McGowan would allow the person purchasing drugs into the house. McGowan was present when the drug sales occurred, and the drug sales occurred "[a]ll the time." *Id.* at 31. Loynes was "the main person"

selling the drugs, but "if he was like, 'Give this to them,' then [McGowan] would." *Id.* at 32. McGowan would take money from the people buying drugs when Loynes was home and when he was gone. J.L. observed drug dealing at this house, and the children were exposed to this activity. He saw drugs in the living room on the television stand. J.L. also observed the making or cooking of crack cocaine, McGowan was "around to see this happen," and the children were exposed to it as well. *Id.* at 126. J.L. would do the dishes and would have to clean some of the white residue off the dishes. At some point, McGowan and/or Loynes went through J.L.'s clothes in a closet looking for marijuana because they had stored it in his clothes for some reason.

[7] While McGowan was present, Loynes told T.L. and J.L. to take money from certain individuals who had previously bought drugs, and T.L. or J.L. took money from people while living in the house on Temple when Loynes and McGowan were not present. While transporting T.L. to school in the morning with the other children in the vehicle, McGowan would stop at one of the trap houses and retrieve money from Loynes. During one occasion during this time, McGowan drove T.L. to a trap house and T.L. accompanied McGowan inside.

[8] In March 2014, the State charged McGowan with ten counts of neglect of a dependent as class C felonies. In March 2017, the State filed a motion to file amended information asserting that Loynes's case was disposed and that his case would not be tried with McGowan's case and replacing the phrase "JAMES LOYNES and TANESHA MCGOWAN" from the last sentence in Counts 1, 3, 5, 7, and 9, with the phrase "JAMES LOYNES and/or

TANESHA MCGOWAN." Appellant's Appendix Volume II at 119. The court granted the State's motion to amend the information.

[9] In March and April 2017, the court held a bench trial. The State presented the testimony of T.L., who was seventeen years old at the time of trial, J.L.J.R., who was sixteen years old at the time of trial, and J.L., who was nineteen years old at the time of trial. During cross-examination, T.L. testified that McGowan never married Loynes, adopted her, or obtained any kind of legal custody over her. It found McGowan guilty of Counts 1, 3, 5, 7, and 9. The court sentenced McGowan to four years with 1,386 days suspended for each count and ordered that the sentences be served concurrently.

## *Discussion*

[10] The issue is whether the evidence is sufficient to sustain McGowan's convictions for Counts 1, 3, and 5, which relate to J.L., T.L., and J.L.J.R. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* at 147. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.*

[11] McGowan argues that the evidence is insufficient with respect to J.L., T.L., and J.L.J.R. because they were not her children, she had no custodial rights to them, and had no authority to separate them from their father. Without citation to the record, she asserts that it was Loynes who decided where his children would move and live. She contends that while she may have opened her heart to his children and assumed a parental role, she did not have legal authority over them. She argues that, while she could have notified authorities so that child welfare could have intervened, that failure is insufficient to establish that she knowingly placed the children in a dangerous situation and cites *Fisher v. State*, 548 N.E.2d 1177 (Ind. Ct. App. 1990). She requests that we reverse her convictions for Counts 1, 3, and 5. The State argues that the evidence is sufficient to show that McGowan placed J.L., T.L, and J.L.J.R. in a dangerous situation.

[12] The amended charging information for Count 1 alleged that McGowan, on or about or between July 1, 2011, and July 16, 2013, had the care of a dependent who was under the age of eighteen years, J.L., did knowingly or intentionally place J.L. in a situation that endangered the life or health of J.L. by taking J.L. to and/or residing in an unsafe residence where J.L. had access to illegal drugs and/or firearms and/or illegal drug transactions were conducted and/or where

illegal drugs were being manufactured. Counts 3 and 5 contained similar allegations with respect to T.L. and J.L.J.R. respectively.[2]

[13]    The offense of neglect of a dependent is governed by Ind. Code § 35-46-1-4. At the time of the offenses, the statute provided in part:

> (a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
>
>> (1) places the dependent in a situation that endangers the dependent's life or health;
>
> * * * * *
>
> commits neglect of a dependent, a Class D felony.
>
> (b) However, the offense is:
>
>> (1) a Class C felony if it is committed under subsection (a)(1), (a)(2), or (a)(3) and:
>>
>>> (A) results in bodily injury; or
>>>
>>> (B) is:
>>>
>>>> (i) committed in a location where a person is violating IC 35-48-4-1 (delivery, financing, or manufacture of cocaine, methamphetamine, or a narcotic drug) . . . .

---

[2] Counts 7 and 9 related to K.L. and D.A., and Mother does not challenge her convictions under those counts.

Ind. Code § 35-46-1-4.[3] Ind. Code § 35-46-1-1 defines "[d]ependent" as "(1) an unemancipated person who is under eighteen (18) years of age; or (2) a person of any age who has a mental or physical disability." "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b).

We note that the record reveals that McGowan moved to Atlanta with Loynes after the death of the mother of Loynes's children and she helped take care of and cared for Loynes's children, cooked for them, enrolled them in school, transported them to school, and assumed a "kind of a parent-like role." Transcript Volume II at 108. In Indiana, McGowan continued to cook for the children and transport them to school. Under the circumstances, we conclude that the State presented sufficient evidence of a probative nature from which a

---

[3] This version of the statute became effective July 1, 2007. The statute was subsequently amended effective February 22, 2012, but this amendment does not pertain to this portion of the statute. *See* Pub. L. No. 6-2012, § 227 (eff. February 22, 2012). The statute was amended effective July 1, 2013, and this amendment, in part, revised Ind. Code § 35-46-1-4(b)(1)(B) to provide:

> (B) is:
>
>> (i) committed in a location where a person is violating IC 35-48-4-1 (delivery, financing, or manufacture of cocaine or a narcotic drug) or IC 35-48-4-1.1 (delivery, financing, or manufacture of methamphetamine); or
>> (ii) the result of a violation of IC 35-48-4-1 (delivery, financing, or manufacture of cocaine or a narcotic drug) or IC 35-48-4-1.1 (delivery, financing, or manufacture of methamphetamine);

*See* Pub. L. No. 193-2013, § 6 (eff. July 1, 2013). The statute was further amended by Pub. L. No. 158-2013, § 550 (eff. July 1, 2014); Pub. L. No. 168-2014, § 85 (eff. July 1, 2014); Pub. L. No. 113-2017, § 14 (eff. July 1, 2017); Pub. L. No. 183-2017, § 58 (eff. July 1, 2017); Pub. L. No. 252-2017, § 17 (eff. July 1, 2017); and Pub. L. No. 263-2017, § 3 (eff. July 1, 2017).

reasonable trier of fact could find beyond a reasonable doubt that McGowan voluntarily assumed the care of J.L., T.L, and J.L.J.R.

[16] The record reveals that Loynes's children were exposed to an environment containing marijuana, cocaine, and drug dealing, as well as firearms located where the children could access them. Further, McGowan was around the drugs, accepted money for drugs in the presence of the children, and was around the kitchen with the children when drugs were being cooked. To the extent McGowan asserts that she personally did not place Loynes's children in a dangerous situation, the record specifically reveals that she would allow persons purchasing drugs into the house, took the children to, and sometimes into, trap houses, and exchanged cocaine or pills for money while transporting the children to or from school.

[17] To the extent McGowan cites *Fisher*, we find that case distinguishable. In *Fisher*, the defendant allowed a mother and her child to stay at his residence. 548 N.E.2d at 1177-1178. The State argued that the defendant neglected the child because he knew of mother's abuse of the child yet "left the defenseless child to be beaten to death by its mother." *Id.* at 1179. We held that it was reasonable to infer from the evidence that the defendant voluntarily assumed the care of the child but that he did not place the child in that situation and that the mother and child had a legal relationship which, unless otherwise terminated or modified, gave her the legal right to custody of her child. *Id.* We explained that the defendant's failure to notify authorities that the mother was abusing the child constituted the offense of failing to report child abuse but his

failure to report was insufficient to establish that he knowingly placed the child in a dangerous situation. *Id.* at 1180.

[18] Unlike in *Fisher*, the record reveals that McGowan did not merely fail to report Loynes's activities. As detailed, McGowan's own actions placed the children in a dangerous situation. *See Dowler v. State*, 547 N.E.2d 1069, 1072 (Ind. 1989) (holding that Ind. Code § 35-46-1-4 "does not limit its coverage to those acting only with authority or permission but provides one having the care of a dependent whether assumed voluntarily or because of a legal obligation" and holding that there was more than sufficient evidence supporting the defendant's conviction for neglect of a dependent).

### *Conclusion*

[19] For the foregoing reasons, we affirm McGowan's convictions.

[20] Affirmed.

Baker, J., and Riley, J., concur.